# United States Court of Appeals
## For the First Circuit

_____

No. 23-1737

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

Debtors,
_____

GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE, INC.,

Movants-Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY,

Debtor-Appellee,

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

Interested Party-Appellee,

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS OTHER THAN PBA AND COFINA,

Intervenor,

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,

Intervenor.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Hon. Laura Taylor Swain,[1] U.S. District Judge

Before

Kayatta, Thompson, and Rikelman,
Circuit Judges.

Thomas E. Lauria, with whom Glenn M. Kurtz, John K. Cunningham, White & Case LLP, and Lydia M. Ramos Cruz were on brief, for appellant GoldenTree Asset Management LP.
Susheel Kirpalani, Eric Kay, Quinn Emanuel Urquhart & Sullivan, LLP, Rafael Escalera, Carlos R. Rivera-Ortiz, and Reichard & Escalera on brief for appellant Syncora Guarantee, Inc.
Martin J. Bienenstock, with whom Mark D. Harris, Margaret A. Dale, Timothy W. Mungovan, John E. Roberts, and Proskauer Rose LLP were on brief, for appellees the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Electric Power Authority, and the Puerto Rico Fiscal Agency and Financial Advisory Authority.
Pedro A. Jimenez, with whom Luc A. Despins, Eric D. Stolze, and Paul Hastings LLP were on brief, for intervenor Official Committee of Unsecured Creditors for all Title III Debtors, other than PBA and Cofina.
Michael C. McCarthy and Maslon LLP on brief for intervenor U.S. Bank National Association, as Trustee.

January 22, 2024

---

[1] Of the Southern District of New York, sitting by designation.

**KAYATTA**, <u>Circuit Judge</u>.  This case arises from a proceeding to restructure the debts of the Commonwealth of Puerto Rico's public power company ("PREPA") under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  Appellants GoldenTree Asset Management and Syncora Guarantee (the "Bondholders") hold around $1 billion of PREPA's roughly $8 billion in bonds.  Since 2017, the Bondholders -- and similarly-situated creditors and insurers -- have sought relief from PROMESA's so-called automatic stay on actions against PREPA's estate.  The Bondholders want this relief so they can seek the appointment of a receiver for PREPA.

In this appeal, the Bondholders argue that the automatic stay lifted by operation of law, because the district court overseeing the Title III restructuring (the "Title III court") denied their latest motion for relief without first noticing and holding a hearing within the timeframe prescribed by 11 U.S.C. § 362(e)(1).  We hold that the Bondholders waived their right to prompt notice and hearing on that motion for relief.  This is because the Bondholders accepted a litigation schedule that postponed any hearing on their request for leave to seek appointment of a receiver until after a parallel proceeding about whether -- and to what extent -- the Bondholders had any collateral to protect in the first place.  We therefore affirm the judgment of the Title III court.  Our reasoning follows.

## I.

To frame our analysis, we first summarize: (A) the applicable statutory law; (B) the relevant details of the Bondholders' loan agreement with PREPA; and (C) the procedural history of this case.

### A.

Title III of PROMESA authorizes the Financial Management and Oversight Board of Puerto Rico (the "Board") to restructure Puerto Rico's public debt through "quasi-bankruptcy proceedings." See Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for P.R., 872 F.3d 57, 59 (1st Cir. 2017). The automatic stay provision of the Bankruptcy Code applies to those proceedings. See 11 U.S.C. § 362 (automatic stay provision); 48 U.S.C. § 2161(a) (incorporating the automatic stay into PROMESA). In brief, a petition for restructuring under Title III "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of [or from] the [debtor's] estate . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Thereafter, the Title III court may lift, modify, or otherwise grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of [the requesting] party in interest." 11 U.S.C. § 362(d)(1).

Section 362(e)(1) grants creditors the right to a prompt hearing on requests for relief from the automatic stay. Once a

party requests such relief, the stay terminates in thirty days unless the court "after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination [of the motion's merits]."  11 U.S.C. § 362(e)(1).  Any such continuance, though, lasts for only thirty days after the preliminary hearing, unless either the parties agree otherwise or the court finds that "compelling circumstances" justify some other specified delay.  Id.

**B.**

Here, the Bondholders loaned PREPA money pursuant to a contract called the Trust Agreement.  The pertinent terms of that contract are authorized by (and in some instances set forth in) the Authority Act, which is the Commonwealth legislation that established PREPA.  See, e.g., 22 L.P.R.A. §§ 193, 196(o), 206.  Three aspects of the Trust Agreement are relevant here.

First, the Trust Agreement governs how PREPA must distribute its revenues.  See 22 L.P.R.A. § 206(e)(1) (allowing revenue distribution provisions in PREPA's loan agreements).  Broadly speaking, the Trust Agreement establishes a "waterfall" structure.  PREPA's revenues first flow into a General Fund.  PREPA draws on the General Fund to pay current expenses.  Any remaining revenue -- minus a reserve for future operating expenses -- then streams into the Revenue Fund.  The money in the Revenue Fund cascades first into the Sinking Fund, which pays outside creditors

like the Bondholders, and then into the Subordinate Funds, which finance non-operating expenses such as capital improvements.

Second, and of particular importance to the Bondholders, the Trust Agreement requires PREPA to charge rates sufficient to cover both its current expenses and 120% of its bond service obligations for the following fiscal year.  See id. § 206(e)(2) (permitting such rate covenants).

Third, the Trust Agreement specifies remedies that apply if PREPA defaults on its obligations to its creditors.  Notably, if PREPA defaults, then the creditors may place PREPA into receivership if: (1) more than thirty days have passed since default, and (2) bondholders representing 25% of the outstanding principal amount request receivership.  Under the Authority Act, such a receiver can take steps aimed at forcing PREPA to collect and apply sufficient revenue to cure the utility's default.  See id. § 207(a)-(b).

PREPA has been in default since mid-2017.  See In re Fin. Oversight and Mgmt. Bd. for P.R., 899 F.3d 13, 18 (1st Cir. 2018).  Moreover, the Bondholders assert (and the Board does not dispute) that creditors representing at least 30% of the outstanding principal bond amount have requested receivership.  Therefore, the Bondholders' right to seek the appointment of a receiver for PREPA appears to have been triggered.  But as long as the automatic stay remains in effect, the Bondholders may not

exercise control over PREPA by seeking appointment of a receiver. See, e.g., In re Bello, 612 B.R. 389, 394-95 (Bankr. E.D. Mich. 2020). They must first obtain relief from the automatic stay.

## C.

We complete our initial framing by summarizing the travel of this case, training our attention on the Bondholders' efforts to lift the automatic stay over the course of six years.

### 1.

Within a month of PREPA entering Title III proceedings in 2017, the Bondholders filed their first motion to lift the automatic stay. The Bondholders argued that there was cause to lift the stay because their property interests in PREPA's estate lacked adequate protection. More specifically, they argued that PREPA had failed to set sufficient rates, mismanaged its operations, and misdirected revenues away from debt service. The Bondholders therefore sought appointment of a receiver to ensure a steady stream of debt service payments.

The Title III court denied the motion in September 2017, concluding that PROMESA barred a Title III court from letting PREPA fall into receivership. The court also found that, in any event, there was no cause to lift the stay. On appeal, this court partially reversed, holding that PROMESA did not foreclose PREPA entering receivership. In re Fin. Oversight & Mgmt. Bd. for P.R.,

899 F.3d at 21-22.  We then remanded the case so the Bondholders could file an updated lift-stay motion.  Id. at 24.

### 2.

Syncora filed the second lift-stay motion in October 2018.[1]  The second lift-stay motion's arguments were substantially identical to those in the first motion.  Ultimately, Syncora did not prosecute the second lift-stay motion.  Instead, Syncora and other PREPA creditors concluded a restructuring agreement with the Board in September 2019.  At the parties' request, the Title III court indefinitely stayed the second lift-stay motion.  Syncora eventually abandoned it entirely.[2]

### 3.

Three years passed.  Then, in September 2022, the Puerto Rico Financial Advisory and Fiscal Agency Authority terminated the 2019 restructuring agreement.  That termination triggered two separate proceedings.

First, the Board moved to reanimate a previously-stayed adversary proceeding (the "Adversary Proceeding"), in which the Board challenged the Bondholders' claims to possess enforceable

---

[1] GoldenTree was not a party to the second lift-stay motion.

[2] Upon filing their third motion, the Bondholders requested that the court dismiss the second motion as superseded by the third.

property interests in PREPA's estate.³  The Board's complaint alleged that the Bondholders only had an enforceable property interest in moneys already deposited in the Sinking and Subordinate Funds.  According to the complaint, the Bondholders did not have an enforceable interest in PREPA's overall revenues, the contractual covenants in the Trust Agreement, or the right to seek a receiver.

Second, a group of creditors that included Syncora and GoldenTree filed a joint motion to dismiss the Adversary Proceeding.  The Bondholders argued that if the court did not grant the motion to dismiss, it should alternatively lift the automatic stay so the Bondholders could seek appointment of a receiver.  We refer to this alternative request as the "third" motion for relief from the automatic stay.⁴  As before, the Bondholders contended that appointment of a receiver was critical.  In their words, "the time [had] come to permit the PREPA Bondholders to exercise their . . . right to obtain the appointment of a receiver to set affordable and sustainable electricity rates sufficient for PREPA

---

³ The Board had filed the complaint in the Adversary Proceeding before the 2019 restructuring agreement, but agreed to stay it -- along with the second lift-stay motion -- after the parties reached the restructuring agreement.

⁴ We set aside as waived the question of whether a conditional lift-stay motion (i.e., a lift-stay motion requesting that the court first consider a separate motion, and then shift focus to the lift-stay motion itself) triggers the thirty-day clock under section 362(e)(1).

to pay its debts."  To further justify the requested relief, the Bondholders cited the length of the restructuring proceeding, and PREPA's alleged failure to prosecute that proceeding.

The confluence of these dueling filings left the Title III court with a scheduling question:  Which motion should it decide first?  Should it start with the Bondholders' request for leave to seek a receiver who would protect the Bondholders' interests, or with the Board's challenge to the very nature and scope of those interests?  The Board urged the court to start with the Adversary Proceeding, suggesting it made no sense to lift the automatic stay before defining the scope of the Bondholders' protectable interest in PREPA's estate.  The Bondholders countered that the court should start with the lift-stay motion.  In the alternative, the Bondholders suggested that the court could resolve the Adversary Proceeding first, while also setting strict deadlines for PREPA to file a restructuring plan.

At a hearing held within thirty days of the filing of the Bondholders' third lift-stay motion, the Title III court concluded that the Adversary Proceeding "should go first."  The court reasoned that to the extent the third lift-stay motion sought "relief from the stay to appoint a receiver to race to pay the [B]ondholders," granting the motion would "disrupt an already complex process, all based on an assertion of a right whose enforceability and factual foundation are questionable."  To put

the horse before the cart, so to speak, the court outlined a litigation schedule for resolving the Adversary Proceeding first, while staying the third lift-stay motion in the interim.

No party argues on appeal that the Title III court's stay of the third lift-stay motion was reversible error.  And the Bondholders do not contend that the Title III court should have decided the third motion before now.  On the contrary, in the third lift-stay motion, the Bondholders expressly agreed to "waive the [thirty]-day time limit . . . and to adjust the timing for objections, briefing, and other proceedings to ensure they are adjudicated together in the most efficient manner possible for all interested parties."  Such waivers are permissible under section 362(e).  See 11 U.S.C. § 362(e)(1) (noting that the time limit for resolving a lift-stay motion may be "extended with the consent of the parties in interest").

**4.**

On March 22, 2023, the Title III court issued a partial summary judgment order that resolved some -- but not all -- of the issues raised by the Adversary Proceeding.  As relevant here, the court concluded that the Bondholders had a security interest only in moneys deposited into the Sinking and Subordinate Funds.  They did not have a security interest in all PREPA revenues, or in the relevant remedies and covenants in the Trust Agreement (i.e., the covenant to raise rates and the right to appoint a receiver).  To

the extent the Bondholders had any claim on PREPA's overall revenues, it was an unsecured claim for the present value of PREPA's future net revenues. The Title III court eventually estimated that claim at around $2.4 billion. The court left several issues undecided. These included (among other things) the Bondholders' requests for declaratory judgment that PREPA had breached its contractual covenants, breached trust obligations on behalf of the Bondholders, and unconstitutionally taken the Bondholders' property without just compensation.

Rather than continue to abide by the Title III court's unchallenged order of proceedings, the Bondholders filed a fourth motion to lift the automatic stay on August 24, 2023. Like the stayed third motion, the fourth motion sought relief from the automatic stay so the Bondholders could "enforce their statutory right to appointment of a receiver." And like the stayed third motion, the fourth motion alleged that PREPA had both refused to raise electricity rates and mishandled the diminished revenues it received.

In a sua sponte order -- which is the order now on appeal -- the Title III court stayed consideration of the fourth lift-stay motion, citing its prior ruling concerning the third motion. The court reasoned that the Bondholders could not unilaterally disrupt the established order of proceedings by demanding a prompt hearing on a motion that was "substantially duplicative" of the

third motion (i.e., the motion the Bondholders had already agreed to stay). As the Title III court put it, the Bondholders were trying to "achieve the litigation schedule they desire[d] by purporting to be strangers to the already-pending proceedings."

The Bondholders timely appealed. After we received briefing and heard oral argument in this appeal, the Title III court issued a final summary judgment order in the Adversary Proceeding. In that order, the court reaffirmed that: (1) the Bondholders have a security interest only in moneys deposited in the Sinking and Subordinate Funds; (2) the Bondholders have no property interest in PREPA's overall revenues, or in "revenues not yet collected for electricity not yet generated" by PREPA; and (3) the Bondholders do not have a property right in the covenants and remedies outlined in the Trust Agreement and/or PREPA's enabling statute. Notwithstanding the issuance of the final summary judgment order, the Bondholders have apparently neither filed a renewed motion for relief from the stay, nor sought a hearing on the third or fourth motions. They have, however, filed an appeal from the summary judgment order.

## II.

Having summarized the events giving rise to this appeal, we begin our analysis by addressing two threshold challenges to the Bondholders' ability to press on with this appeal.

A.

The first challenge concerns finality.  The parties appear to agree that we may exercise jurisdiction over this appeal only pursuant to the collateral order doctrine.[5]  And the Board insists that the doctrine's requirements have not been satisfied here.

To qualify as collateral, an order must (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) be "effectively unreviewable on appeal from a final judgment."  Doe v. Mass. Inst. of Tech., 46 F.4th 61, 65 (1st Cir. 2022) (quoting Will v. Hallock, 546 U.S. 345, 349 (2006)).

This circuit has not addressed whether orders delaying consideration of a lift-stay motion beyond the thirty-day window established by 11 U.S.C. § 362(e)(1) are collateral orders.  But we need not address that question today.  We may assume -- without deciding -- that we have jurisdiction when a case "poses a question of statutory, not Article III, jurisdiction," Doe v. Town of

---

[5]  We do not hold that the collateral order doctrine is indeed the only theory that could justify appellate jurisdiction in this case.  But the parties have never suggested an alternative basis for our jurisdiction, so they have waived any arguments to that effect.  United States v. Coplin, 463 F.3d 96, 102 n.6 (1st Cir. 2006) (noting that arguments not made in opening briefs are waived).

Lisbon, 78 F.4th 38, 44 (1st Cir. 2023), and when the "decision on the merits will favor the party challenging the court's jurisdiction," id. at 45 (quoting Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020)).  Those criteria are satisfied here.  The Board is challenging only our statutory jurisdiction.  See id. at 44 n.2 (noting that the collateral order doctrine interprets the statutory grant of appellate jurisdiction outlined in 28 U.S.C. § 1291).  And as we will explain below, our merits decision ultimately favors the Board.  So, we may assume our own jurisdiction without "sort[ing] out [the] thorny jurisdictional tangles" that this case presents.  Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006).

**B.**

This brings us to the second challenge.  The Official Committee of Unsecured Creditors (the "Committee") -- which has intervened on the Board's behalf -- alleges that the Bondholders lack any enforceable right that we may vindicate on appeal.  The Committee's argument appears to have two parts.

First, the Committee insists that the PREPA bonds are non-recourse instruments.  In the Committee's view, the Bondholders may sue only to recover moneys deposited in the Sinking and Subordinate Funds.  Therefore, the Committee argues, the Bondholders have no basis on which to seek a receiver, which would necessarily exercise control over the entire PREPA estate, and not

just the Sinking and Subordinate Funds. But the scope of the recourse provided by the PREPA bonds is a disputed merits issue. And the Bondholders' claim to have recourse against PREPA is hardly so weak as to preclude them from even seeking to have a receiver appointed. Indeed, the Title III court found in its partial summary judgment order that the bonds were recourse instruments. That ruling is now on direct appeal, but we see no reason to disturb it in the meantime.

Second, the Committee claims that under the Title III court's final summary judgment ruling, the Bondholders cannot invoke 11 U.S.C. § 362(e). The argument here is that section 362(e) protects only secured creditors, and the Title III court concluded that the Bondholders have no security interest in the right to appoint a receiver.

But the Bondholders are, in fact, secured creditors under the Title III court's summary judgment orders. As that court recognized, the Bondholders have -- at least -- an enforceable security interest in the moneys deposited in the Sinking and Subordinate Funds. Therefore, the Bondholders may bring a claim for relief from the automatic stay, even if we assume that only secured creditors may seek such relief. Whether the Bondholders' security interests are more extensive than the Title III court recognized, and whether more extensive security interests would

bolster the case for lifting the automatic stay, are questions we need not answer now.

We therefore reject the Committee's arguments, assume our own statutory jurisdiction, and proceed to the merits of this appeal.

### III.

As we explained above, the Title III court considered the fourth lift-stay motion to be "substantially duplicative of the [third] motion." And the ruling on that third motion had been stayed. So, the Title III court treated the fourth motion as similarly stayed. In their brief on appeal, the Bondholders advance only two criticisms of that ruling.

First, the Bondholders argue that their fourth motion proffers an alternative theory of relief, and therefore is not "duplicative" of the third motion. But both motions seek precisely the same remedy: relief from the automatic stay "so [the Bondholders] c[an] seek [the] appointment of a receiver." And the motions also present identical justifications for seeking a receiver. In the third motion, the Bondholders argue that a receiver would "seek reasonable rates sufficient to pay PREPA's bond debt, other creditors, and necessary operating expenses." Meanwhile, in the fourth motion, the Bondholders envision that a receiver would "require PREPA to raise rates, collect revenues and deposit Net Revenues into the accounts comprising the Sinking Fund

- 17 -

to repay the Bonds." We struggle to see any daylight between these two justifications.

Granted, the Bondholders slapped a fresh coat of paint on the fourth motion. By its terms, that motion relies on a theory of "adequate protection," while the third motion relies on a theory of "unreasonable delay." But this is a semantic distinction, not a substantive one. Under the third motion's unreasonable delay theory, keeping the automatic stay in place ensures that the Bondholders "receiv[e] less value in exchange for their claims, in real terms, than they are in fact entitled to receive." To phrase it slightly differently, the unreasonable delay theory suggests that the longer the automatic stay remains in place, the less money (in real terms) the Bondholders will get back from PREPA. Meanwhile, under the fourth motion's adequate protection theory, the longer the automatic stay remains in place, the less money the Bondholders will get back from PREPA, which is allegedly misappropriating revenues that rightfully belong to its creditors. Indeed, as GoldenTree states in its opening brief, the purpose of the fourth lift-stay motion is "to vindicate [the Bondholders'] rights, which are at the brink of destruction."

In either case, the central theory of harm is the same: As more time passes, PREPA's alleged under-collection and misappropriation of revenues will get worse, making it even harder for the Bondholders to get their money back. Seen this way, the

third and fourth motions advance fundamentally identical theories. Both motions seek the same relief (i.e., appointment of a receiver) to alleviate the same harm (i.e., the failure to collect and deposit PREPA revenues).  So, we ultimately agree with the Title III court that the fourth motion is simply the third motion by another name.

That brings us to the Bondholders' second contention, which is that factual circumstances have changed since the Title III court stayed resolution of the third motion.  At a basic level, this is true.  Between the third and fourth motions, the Title III court ruled on some (but not all) of the issues implicated by the Adversary Proceeding.  It also entered an estimation order setting the value of the Bondholders' unsecured claim on PREPA's net revenues.  Clearly, these new rulings cast a pall over the Bondholders' financial interests.

We do not see, though, why these developments justified demanding a hearing that would disrupt the Title III court's standing order of proceedings.  After all, the Title III court stayed consideration of the Bondholders' lift-stay motions precisely because it anticipated that rulings in the Adversary Proceeding would bear on the merits of the lift-stay motion.  The court's scheduling order was basically a gating mechanism, which held in abeyance any lift-stay motion until the court could determine the scope of the Bondholders' claimed interests in

PREPA's estate.  So, the fact that the Title III court ruled on some of the issues in the Adversary Proceeding was hardly an unforeseen change in circumstances that permitted the Bondholders to unilaterally subvert the scheduling order.  On the contrary, the scheduling order expressly contemplated those rulings.

## IV.

The Bondholders were subject to a scheduling order.  They never sought relief from that order.  Nor did they ever claim that the order's postponement of a final hearing on the third-lift stay motion violated section 362(e)(1).  Thus, we agree with the Title III court that the Bondholders could not unilaterally circumvent that scheduling order by simply refiling -- without leave -- a materially identical version of their stayed third motion.  To hold otherwise would be to invite chaos.

That being said, it appears that the Title III court's final summary judgment order in the Adversary Proceeding could open the door to a prompt ruling on a renewed (or entirely new) motion for relief from the automatic stay. Nothing in this opinion precludes the Bondholders from pressing such a motion.

For the foregoing reasons, we _affirm_ the judgment of the Title III court.